UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                           Plaintiff,<br><br>          v.<br><br>ZACHARY AUGUSTUS SMULSKI,<br><br>                         Defendant. | No. CR16-239RSL<br><br>DEFENDANT'S<br>SENTENCING MEMORANDUM |

On March 29, 2017, the defendant appeared before a United States Magistrate Judge and entered pleas of guilty to Counts 1, 2 and 3, each of which charged him with wire fraud related to his employment as Chief Financial Officer of Soundpath Health, Inc. Sentencing is scheduled to occur on June 30, 2017.

In this memorandum, we present the defense sentencing recommendation. In addition, we discuss the facts, respond to arguments that the government has presented to the Probation Office, and outline certain considerations relevant to the determination of an appropriate sentence.

## I.

## SENTENCING RECOMMENDATION

We recommend that Mr. Smulski be sentenced to a term of three years' probation, with the following conditions: (1) that he make restitution to Soundpath Health, Inc. in the amount of $29,514.70 (representing professional fees that Soundpath incurred after learning that certain sale-

leaseback funds had been temporarily placed in an account that was not a regular Soundpath account), and that he perform 100 hours of community service. Mr. Smulski will pay the restitution amount in full, at the time of sentencing. A copy of the check has been provided to the government and to the Probation Office.

## II.

## ZACHARY SMULSKI

Mr. Smulski is 58 and, aside from this case, has led an uneventful life in which education and hard work have paid the dividends that one always hopes they will pay – steady employment in a responsible professional position, three children by a first marriage,[1] and, after he and his first wife grew apart, a stable second marriage.[2] Mr. Smulski grew up in Southern California. He obtained an accounting degree from City University in 1981 while working as an accountant for Safeco Insurance. Later, while working for Regence Blue Shield and Sea Mar Community Health Centers, he took evening classes at the University of Washington. He obtained the M.B.A. degree in 2003. He worked in the accounting departments in a succession of healthcare companies -- Olympic Health Management, Regence Blue Shield and SeaMar. At Sea-Mar, a healthcare organization with headquarters in South Park serving primarily a low-income population, he was the CFO.

---

1. Mr. Smulski's daughters are Rachel, a program director at a local university, Rebecca, a youth minister at a local church, and Hannah, who graduated from George Fox University in May.

2. Mr. Smulski's second wife, Hella Monroy, is a businesswoman who currently operates a vocational school. Due to dwindling enrollment, it is anticipated that the school will close in September.

DEFENDANT'S SENTENCING
MEMORANDUM - 2

In 2008, Smulski learned that a newly-formed healthcare company, Puget Sound Health Partners, Inc.[3] was seeking a CFO. He applied for the position and was hired in October 2008.

### III.

### SOUNDPATH HEALTH, INC.

*A. The Formation of Soundpath and its Regulatory Difficulties*

In 2007, two groups of physicians – Northwest Physicians Network of Washington ("NPN") and Physicians of Southwest Washington ("PSW") – joined with a third physician group to form Puget Sound Health Partners, Inc. By 2010, the third physician group had sold their shares. As a result, NPN owned half of the stock of Soundpath, and PSW owned the rest. The members of Soundpath's board were NPN physicians and PSW physicians, an equal number of both.

The business of Soundpath was to contract with the Center for Medicare Services ("CMS"), receive CMS capitation payments for elderly persons seeking health care coverage under Medicare Advantage plans, and manage the care of the Medicare recipients.[4] In effect, Soundpath operated as a pass-through entity for its owners. Pursuant to contracts between NPN and PSW, on the one hand, and Soundpath, on the other, Soundpath paid 85% of the capitation payment to NPN or PSW, as the case might be. Soundpath also agreed to pay NPN an additional

---

3. In 2011, the company's name was changed to Soundpath Health, Inc. We use Soundpath to refer to the company throughout this memorandum.

4. The capitation payment was approximately $10,000 per Medicare recipient, per year. Through the capitation system, CMS transferred, to entities offering Medicare Advantage plans, the risk that overall medical costs would exceed $10,000 per enrollee. The system was intended to create incentives for plan operators to promote good health and to hold down costs by dis-incentivizing overtreatment.

DEFENDANT'S SENTENCING
MEMORANDUM - 3

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

percentage to administer medical management in efforts to control overall health care costs. Soundpath also agreed to pay PSW an additional percentage to provide claims administration services. The contracts were made at the outset and could be altered only by the board.

Soundpath was regulated by Washington's Office of Insurance Commissioner ("OIC"). The OIC supervised Soundpath (as it did other health care insurers in Washington) using Statutory Accounting Principles. Statutory Accounting Principles differed from Generally Accepted Accounting Principles – the former, designed to protect health care consumers from the insolvency of an insurance provider, is more conservative than GAAP.

Beginning with its formation in 2007, Soundpath grew rapidly. Thousands of new participants were added to the rolls. With new enrollees came requirements of increased capital reserves. Funds available to meet the augmented reserve requirements lagged behind the company's membership growth.

From the beginning, OIC had concerns over Soundpath's financial viability, including concerns over the payment rates to contracted providers (*i.e.*, NPN and PSW).[5] On September 26, 2008 (Exhibit A), a representative of OIC wrote to Soundpath's CEO noting that Soundpath's number of enrollees exceeded the forecasted number and asking if Soundpath was "planning any further changes in its payment rates with contracted providers" – *i.e.*, the 85% of the capitation that Soundpath paid to NPN and PSW. By a further letter also dated September 26, 2008 (Exhibit B), OIC directed Soundpath to file monthly financial reports with OIC and to provide OIC with its monthly internal financial statements and a schedule expressing those statements in terms of

---

5. In recounting OIC's concerns about Soundpath and the pressures that Smulski faced as a result, we do not seek to excuse his actions, but to place them in context.

DEFENDANT'S SENTENCING
MEMORANDUM - 4

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

Statutory Accounting Principles. The financial problems continued until 2012. On April 3, 2012, Deputy Insurance Commissioner James Odiorne issued an order (Exhibit C) requiring the company to stop accepting new enrollments, to restructure its board by adding three "non-affiliate, non-provider" directors, to require PSW to submit a plan for providing claims administration services to Soundpath at fair and reasonable charges that do "not exceed PSW's actual costs associated with processing those claims," and directing other remedial actions. When Soundpath's outside counsel protested the decision, Odiorne wrote back (Exhibit D):

> We have been working with SoundPath since its inception to assist it to become a solid, stable carrier. Our efforts have been largely unheeded and the company's financial structure has continued to deteriorate. SoundPath really must demonstrate that it has made substantial effort to correct the issues we have identified.[6]

This was the financially-challenged environment that Mr. Smulski entered when he joined Soundpath's staff. He was constantly confronted with the need to improve capital reserves. To a large extent, the pressure to improve capital reserves resulted from circumstances beyond Mr. Smulski's control – namely, the company's contracts with NPN and PSW. With NPN and PSW benefiting from their contracts with Soundpath and each holding an equal number of seats on the board, opportunities to improve capital reserves by cutting costs were limited due to the owners' other priorities.

*B. Reinsurance, or "Quota Share," as a Means of Complying with Reserve Requirements*

After he was hired in 2008, Mr. Smulski began looking for ways to improve Soundpath's capital surplus. He reasoned that if Soundpath wasn't able to retain sufficient cash from its

---

6. Soundpath objected to the order and requested a hearing before an administrative law judge. The order was stayed pending the hearing. The eventual sale of a controlling interest in Soundpath to CollabHealth Plan Services, Inc., an affiliate of CHI Franciscan, effectively rendered the order moot.

DEFENDANT'S SENTENCING
MEMORANDUM - 5

operations and increase its capital surplus by adding cash, perhaps Soundpath could reduce the amount of capital surplus needed by transferring some of the risk. In this regard, Mr. Smulski arranged for Soundpath to obtain "corridor" insurance from a Canadian re-insurance firm.[7] By 2011, the Quota-Share agreement reached it limits and was costing an effective interest rate of 8% per year.

### C. Marquette Equipment Finance, LLC

On June 1, 2011, Mr. Smulski and Soundpath's then CEO received unsolicited calls from Wayne Jensen, a representative of Marquette Equipment Finance, LLC ("Marquette").[8] Jensen told Smulski that Marquette was offering a balance sheet management program involving sales and leasebacks of assets. Jensen, who portrayed Marquette as an expert in this area, described the program as a means by which Soundpath could convert non-admitted assets into cash, which would be admitted, thereby increasing Soundpath's capital reserves.[9] Mr. Smulski was persuaded that engaging in sale leasebacks was advisable because it would improve Soundpath's capital

---

7. The agreement is reflected in a letter from Canada Life Reinsurance to Mr. Smulski dated March 16, 2010. The letter [OIC 6419 Bentley 321] is among the documents that the defense submitted to the Probation Officer. The letter and associated documents are attached collectively as Exhibit E.

8. After discussing the calls, the CEO and Smulski decided to explore the sale-leaseback matter further, with Smulski taking the lead.

9. Defense counsel later learned that Marquette's activities had led to a lawsuit in the Middle District of Florida, *IDJB Investments, et al. v. McGladrey, LLP*, No. 14-CIV-1574, wherein a health care company providing Medicare Advantage plans had used sale leasebacks as a means of shoring up its balance sheet by selling and leasing back $28 million worth of "assets" like dubious accounts receivable. The health care company filed suit against their accounting firm, which had approved the accounting treatment of the sale-leasebacks. The matter was settled. The terms of the settlement are not public.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

reserves at a net 4% interest rate, saving Soundpath at least $160,000 per year over the cost of Quota-Share.

Technically, Smulski could perhaps have entered into the Marquette transactions on his own authority as CFO. Soundpath policies required board approval for borrowings in excess of $500,000, but Smulski could have taken the position that the sale leasebacks were not loans and further approval was not needed. However, Smulski saw that the sale leaseback transactions were financing arrangements similar to loans, and he decided to seek board approval.[10] (Furthermore, the board had been deeply involved in dealing with the OIC's concerns about the firm's capital deficiencies since 2008, and the board needed to understand how the sale-leaseback was potentially a better way to increase capital reserves.) On June 21, 2011, he submitted a memorandum to the executive committee/finance committee recommending that Soundpath engage in sale leasebacks. The committee endorsed the proposal and forwarded it to the board. At its meeting on July 14, 2011, the board accepted the recommendation for authorization to enter into capital leases. The matter again came before the board on September 15, 2011 and was again approved.

In all, there were four sale leaseback transactions. The funds derived from Lease No. 1 were sent to Trucaris, Inc. (whose account information Smulski had provided to Marquette), and then those funds were immediately sent to Soundpath. The funds derived from Lease No. 2 were

---

10. Smulski explained to Jensen that there would be some delay in finalizing the transaction, if the transaction was going to occur, because he needed board approval. "It is questionable whether a lease is classified as borrowing, but this transaction is large enough that disclosure is needed." Email from Smulski to Jensen dated June 21, 2011 [JENSEN EMAILS_003884].

DEFENDANT'S SENTENCING
MEMORANDUM - 7

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

divided. Marquette paid about half of the funds directly a vendor who supplied marketing materials to Soundpath. Marquette sent the remaining funds from Lease No. 2 to Trucaris, and Trucaris promptly sent those funds to Soundpath. The funds derived from Lease No. 4 were sent directly to a Soundpath account. The issues in the case *all* arise from Mr. Smulski's understanding and handling of the proceeds of Lease No. 3.

Marquette transferred the net proceeds of Lease No. 3, $1,394,235, to the Trucaris account on September 23, 2011. On September 26, 2011, Mr. Smulski transferred $507,235 of the Lease No. 3 proceeds to Soundpath, leaving $887,000 of the proceeds in the Trucaris account. Under the terms of Lease No. 3, Soundpath was not entitled to receive the funds that temporarily remained in the Trucaris bank account until such time as Soundpath had prepaid commission balances that could be purchased by Marquette using the funds held by Trucaris. In November 2011, Soundpath's prepaid commissions had risen substantially, and Mr. Smulski transferred $255,500 to Soundpath, representing Marquette's purchase of those commissions. This meant that $631,500 remained in the Trucaris account.

During the first quarter of 2012, Soundpath had prepaid a significant amount in commissions to brokers. We have reviewed the checks that were issued to three brokers, although there were others. Commissions paid to The Benefits Company were as follows[11]:

---

11. The checks are found among the records US Bank provided to the government pursuant to subpoena. They appear on Discovery Disc 3, in a PDF that begins USB_021464.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

| Date | Check No. | Amount |
|------|-----------|--------|
| January 3, 2012 | 9301 | 12,450.00 |
| January 25, 2012 | 9403 | 98,100.00 |
| February 4, 2012 | 9453 | 5,491.00 |
| February 8, 2012 | 9486 | 50,508.50 |
| March 7, 2012 | 9635 | 42,365.50 |
| **TOTAL** | | 208,915.00 |

Commissions paid to Vibrant USA were as follows:

| Date | Check No. | Amount |
|------|-----------|--------|
| January 3, 2012 | 9302 | 14,150.00 |
| January 25, 2012 | 9405 | 29,150.00 |
| February 4, 2012 | 9458 | 2,868.00 |
| February 8, 2012 | 9491 | 30,251.50 |
| March 7, 2012 | 9636 | 36,918.25 |
| March 14, 2012 | 9658 | 30,917,25 |
| **TOTAL** | | 144,255.00 |

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

Commissions paid to American Senior Resources were as follows:

| Date | Check No. | Amount |
|------|-----------|--------|
| January 3, 2012 | 9282 | 31,350.00 |
| January 25, 2012 | 9383 | 159,550.00 |
| February 1, 2012 | 9408 | 7,514.00 |
| February 8, 2012 | 9463 | 68,630.50 |
| February 28, 2012 | 9554 | 2,450.00 |
| March 7, 2012 | 9602 | 72,009.25 |
| March 14, 2012 | 9639 | 54,069.75 |
| **TOTAL** | | 405,573.50 |

The total of payments to these brokers was $758,743.50. Soundpath therefore had a significant amount in prepaid commissions that could be sold to Marquette. On April 14th, Mr. Smulski prepared a reconciliation to determine the amount remaining in the Trucaris account (which was less than the prepaid commission total) and to outline the disposition of all of the sale-leaseback proceeds. He then arranged for the remaining amount to be withdrawn from the Trucaris account and deposited into a Soundpath account. On April 18th, he emailed Soundpath's accounting staff [Exhibit M] asking for copies of the checks Soundpath had issued for broker advances, intending to have the checks placed in the sale-leaseback file as backup documentation.

# IV.

## THE ISSUE OF LOSS

### A. The Guidelines

We differ with the Guidelines calculations contained in the draft presentence report.  We submit that that proper application of the Guidelines is as follows:

| | |
|---|---|
| Base Offense Level [Guidelines §2B1.1(a)(1)] | 7 |
| Adjustment for Loss [no loss] | 0 |
| Adjustment for Abuse of a Position of Trust [Guidelines §3B1.3] | + 2 |
| Less Credit for Accepting Responsibility [Guidelines §3E1.1(a)] | - 2 |
| Total Offense Level | 7 |

With a Total Offense Level of 7 and a Criminal History Score of I, the Guidelines range is zero to six months.

### B. Application Note 3(E)

Our position on the issue of loss is based on Application Note 3 to §2B1.1.  Application Note 3(E) provides that the following matters are not counted in calculating the loss:

*(i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected.  The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency;  or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.*

It is well established that where a guideline increases the Offense Severity Level, the party advocating for the application of that guideline bears the burden of proof by a preponderance of the evidence.  Where the guideline is one that reduces the offense level, like acceptance of responsibility, the defendant bears the burden.  Where the guideline is one that increases the

offense level, like loss, the government bears the burden. *United States v. Howard*, 894 F.2d 1085 (9th Cir.), *cert. denied*, 498 U.S. 860 (1990); *see also, United States v. Weber*, 451 F.3d 552, 559 (9th Cir. 2006) (*Howard* cited with approval in an appeal involving disputed conditions of supervised release).

The question presented in this case is whether the government can prove by a preponderance that when Mr. Smulski deposited the $631,500 into a Soundpath account, he knew that his actions vis-à-vis Trucaris were "about" to be detected.

The Ninth Circuit has not had occasion to address Application Note 3 to Guidelines §2B1.1.[12] However, in cases decided before the adoption of the Application Note, the Circuit held that monies repaid to a victim before the offense has been discovered should be credited against the loss amount for Guidelines purposes, *United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004), provided that the repayment was made before the discovery of the offense, *United States v. Stoddard*, 150 F.3d 1140 (9th Cir. 1998). Whether a payment was made before "discovery" is a fact-bound determination. In *Stoddard*, for example, the defendant argued that his loss amount should be zero because he repaid the funds with interest before a criminal referral form was filed with bank regulators. The Ninth Circuit rejected the argument because the repayment was made after the bank's CFO had written to the defendant about discrepancies in certain escrow accounts.

The charges in this case involve wire fraud, and the case is in federal court because interstate wires were used. Mr. Smulski exercised unauthorized control over funds belonging to Soundpath and/or Marquette. Under Washington law, embezzlement is encompassed within the

---

12. Application Note 3 was adopted as part of Chapter 2B when the theft and fraud guidelines were consolidated.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

definition of theft, which is defined as follows: to wrongfully obtain or exert unauthorized control over the property of another with intent to deprive the other of such property. *See* RCW §9A.56.020. To prove embezzlement, facilitated by the use of interstate wire facilities, the government did not need to prove that Smulski intended to cause financial harm to Soundpath. The government needed to prove only that he had a scheme or plan to defraud. As the court stated in *United States v. Treadwell*, 593 F.3d 990, 996 (9th Cir. 2010), "the intended deprivation under §1343 need not be a 'permanent' taking away of money or property. [A] good faith intent to repay money acquired through misrepresentation is not a defense to mail fraud …"

Although the deprivation of funds in this case was intended to be, and was, temporary – something that distinguishes this case from most of the fraud cases found in the reported appellate decisions – the wire fraud statute was clearly violated. Mr. Smulski exercised unauthorized control over money belonging to either Marquette or Soundpath. The plea agreement does not contain an admission that Smulski intended *to keep* the $631,500, nor does it contain a stipulation as to the amount of the loss, if any. The plea agreement states that although Smulski "ultimately returned the remaining $631,500 to Soundpath, he – at the very least – used or intended to use a portion or all of the diverted funds" for other purposes. Plea Agreement, ¶ 7(e). That statement is supported by the fact that the proceeds of Lease No. 3 were deposited into a Trucaris account, where they were commingled with other funds, including some $24,000 that had been invested by Transtar Financial Services. On November 21, 2011, Smulski transferred $24,140 from the Trucaris account into an account in the name of Transtar Financial, after which Mr. Smulski received a Transtar check for $12,000. Presentence Report, ¶ 17. The $24,140 transfer reimbursed Transtar for funds it had contributed toward attorneys' fees and other costs associated

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

with the incorporation of Trucaris, and the $12,000 check partially reimbursed Smulski for funds he had contributed to Transtar.  However legitimate those expenses were, the funds in the Trucaris account before the Marquette funds arrived were insufficient to cover the $24,140 transfer.  Thus, some of the Soundpath-related funds increased the balance in the account and made possible the $24,140 transfer.

The conclusion that Trucaris' retention of the Soundpath-related funds was intended to be temporary is supported by the information presented in the defense letter to Probation Officer Fitzgerald.  We will not restate those arguments here;  rather, we respectfully refer the court to that letter and the documents that were sent with it.  Copies are attached to this memorandum [Exhibit E].

*C.  The Government's Rejoinder to the Defense Objections to the Draft Report*

In Exhibit E, we argued that the loss should be zero.  By letter dated June 13, 2017, the government opposed our suggestion.  The arguments that the government in its letter are premised on speculation and go far beyond what a reasonable view of the evidence would support.

1.  "Mr. Smulski saw [Soundpath's comptroller] speaking with the compliance officer, *and understood he was caught*."  Government's Letter, page 1.  The government does not give a date for this alleged incident.  Mr. Smulski does not recall it.  The government hypothesizes that Mr. Smulski saw the comptroller talking with the compliance officer and further hypothesizes that this observation prompted him to set in motion the process for transferring funds to Soundpath.  Assuming that the comptroller is correct and Mr. Smulski indeed walked by as she spoke with the compliance officer, there is nothing to suggest that it was unusual for the comptroller to be speaking with the compliance officer.

DEFENDANT'S SENTENCING
MEMORANDUM - 14

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

The government's letter, page 2, states that Mr. Smulski began taking measures to provide the $631,500 to Soundpath "the very next day" after the day on which the comptroller claims he saw her speaking with the compliance officer. The government appears to be referring to the issuance of a $610,000 check drawn on a Trucaris account with Merrill Lynch payable to Trucaris, dated April 17, 2012 [SMULSKI_000114].[13] The allegedly triggering conversation can therefore be dated as occurring on April 16, 2012. Smulski's reconciliation was created on April 14, 2012 (see the metadata on the reconciliation, the second document that was submitted to the Probation Office with the letter of objections, Exhibit E[14]). The reconciliation was created before the allegedly triggering incident. It was not an "attempt to do damage control" as the government contends, but was prepared in anticipation of reimbursing Soundpath for the remaining sale-leaseback funds and in order to provide Soundpath and the auditors with a clear picture of how those funds had been handled.

2. The government claims that there was "no accounting or tax reason why Soundpath would have had to place the leaseback funds in the custody of a third party." Government's Letter, page 2. Contrary to this assertion, if the funds were placed with Soundpath before Soundpath had prepaid commissions to sell to Marquette, the status of Soundpath's capital

---

13. Smulski exercised unauthorized control over Soundpath's funds when in December 2011 he created an investment account with Merrill Lynch. Merrill Lynch's records show that there was never any trading in the account.

14. There can be no question about the authenticity of the metadata, or indeed about the authenticity of any of the emails and other documents included as exhibits to this memorandum. Most of the emails were either provided in discovery as PDF documents or were retrieved from an imaged copy of Mr. Smulski's hard drive that the government provided to the defense. OIC provided defense counsel with a limited number of documents pursuant to a Public Records Act request. Defense counsel found other documents, relating to the sale of a controlling interest in Soundpath to CollabHealth, on the OIC's website.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

reserves would not have been improved. The excess $631,500 would have been booked as an asset, but an offsetting loan would have been recorded, resulting in no net benefit to Soundpath.

Although the leases contained a clause stating that Soundpath could not assign the leases without Marquette's consent, Smulski *believed* that assignment of the leases to a third party would be agreed to by Marquette because it was critical to achieving the capital surplus advantages associated with the sale leaseback arrangements. Trucaris, Inc. was a company that Smulski and his business associates (with the help of Cairncross & Hempelman) had formed as a Delaware corporation on April 5, 2011, before Smulski had had any contact with Marquette. Trucaris was to be that third party.

To be sure, approval by Marquette for the assignment was not obtained before Smulski left Soundpath. This does not mean that Marquette would not have approved the assignment to a third party, as the subsequent history shows. On February 19, 2013, Marquette permitted Soundpath to assign its leases to CollabHealth Plan Services, Inc., an affiliate of CHI Franciscan. A Marquette email dated January 22, 2013 (Exhibit F), relating to the approval of the assignment (an unsigned copy of which is attached as Exhibit G), implied that Marquette had been doing assignments "for over a year now." Because of the assignment of its leases to CollabHealth, Soundpath obtained an increase of approximately $2 million in its capital surplus – something that Smulski had sought to achieve in recommending the sale leasebacks.

3. The government alleges that Smulski intended to use the $631,500 because that amount was listed as advance funding in the Foundation Health business plan. Government Letter, pages 2-3. There are several reasons to discredit the assertion of Soundpath's comptroller that she received this document from Smulski. First, the Foundation Health business plan was not found

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

where one might expect it to have been created – on Smulski's hard drive, which Soundpath surrendered to the government and agreed that the investigators could search. Second, no one except Soundpath's comptroller has ever seen the Foundation Health plan. Third, the Foundation Health plan makes no mention of Trucaris.

There are substantial reasons for questioning the comptroller's credibility. If the conversation with the compliance officer in fact occurred, one would think that the compliance officer, herself an attorney, would have immediately notified the CEO, or confronted Smulski to obtain an explanation, or at least written a Comey-esque memo to the file.[15] Second, Mr. Smulski had given the reconciliation to the comptroller. Yet the comptroller never mentioned the reconciliation to the Health and Human Services investigators, although the reconciliation would have assisted them in understanding what had happened with the lease fund transfers.[16] Third, the comptroller misinformed Health and Human Services investigators about the circumstances surrounding Mr. Smulski's departure from Soundpath. She claimed he was demoted and later fired.[17] On the contrary, emails retrieved from Mr. Smulski's hard drive show that he continued to perform his duties at Soundpath after April 16th. (To place these emails in context, it is important to understand the chronology. As noted above, the government's letter states that the alleged

15. The compliance officer was not interviewed as part of the investigation.

16. The reconciliation was later provided to Martha Norberg of the Seabold Group, a forensic accountant retained by Soundpath to investigation possible fraudulent activity. It was included with her work papers and was provided to the defense as part of the pretrial discovery.

17. The government suggests, Government's Letter, page 3, that whether Smulski was fired or resigned is not "pertinent." However, it is extremely pertinent to evaluating the reliability of the information provided by the comptroller. The evidence summarized in the text shows that Mr. Smulski was not "forced to flee the company before his planned exit date [April 27, 2012]." Government's Letter, page 3.

DEFENDANT'S SENTENCING
MEMORANDUM - 17

occasion when the comptroller spoke with the compliance officer would have occurred on April 16th.)

April 16, 2012 12:34 p.m. [Exhibit H].  Smulski emails Joe Pro regarding the name of an individual who attended a lunch with Dr. Hasan.

April 17, 2012 2:47 p.m. [Exhibit I].  Smulski emails Lisa Hoglan of Moss Adams CPA regarding qualification of the leases under SSAP 64.

April 17, 2012 3:03 p.m. [Exhibit J].  Smulski submits a draft consulting agreement to the CEO and Bob Peters, the interim CFO.  The consulting agreement anticipates that Smulski will assist Peters in complying with the ongoing OIC audit after his last day as CFO on April 20

April 17, 2012 3:51 p.m. [Exhibit K].   Smulski responds via email to an inquiry from Soundpath's comptroller concerning SSAP 84 (involving the admission of rebates received from pharmaceutical manufacturers).

April 18, 2012 [Exhibit L].  Smulski, as CFO, attends a special meeting of Soundpath's board.

April 18, 2012 [Exhibit M].  Smulski emails Soundpath's accounting department requesting copies of checks representing advances paid to brokers in February and April.

April 19, 2012 3:38 p.m. [Exhibit N].  Smulski emails to Kim Heuss regarding how Soundpath arrived at its estimated membership for 2013.

April 20, 2012 2:20 p.m. [Exhibit O].  Smulski emails Soundpath's comptroller with regard to the location of two journal entries, which he has returned.

April 20, 2012 2:35 p.m. [Exhibit P].  Smulski emails Rodica Murphy of the OIC, sending Soundpath's response to OIC's request to increase the indemnity deposit.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

*April 20, 2012 2:35 p.m. [Exhibit Q].* Smulski emails Wayne Jensen of Marquette, informing him of Soundpath's financial results for 2011, including the fact that the auditors and regulators have disallowed the majority of the leases for capital reserve treatment, and "this obviously defeats the purposes of the lease transactions from SPH perspective." In reply, Jensen appears indifferent to Soundpath's difficulties and does not respond to Smulski's comments.

*April 23, 2012 8:42 a.m. [Exhibit R].* Smulski emails the CEO and Bob Peters, attaching a partially executed version of an amendment to Soundpath's agreement with the Canada Life Insurance Company.

*April 23, 2012 12:41 p.m. [Exhibit S].* Smulski responds to questions that Shiraz Jetha has raised concerning Soundpath's relationship with TEC.

*April 23, 2012 12:47 p.m. [Exhibit T].* Smulski emails Christine Tomcala and Bob Peters with questions about how the TEC contract works.

In short, the record shows that Mr. Smulski continued to work for Soundpath until April 23, 2012, and on April 23rd he expected to begin as an off-site outside consultant (see Exhibit J).

## V.

### VOLUNTEER ACTIVITY

Mr. Smulski has devoted substantial amounts of time and energy to promoting the provision of medical care and job training to underserved communities. From 2007 to 2013, he volunteered as a board and committee member for Project Access Northwest, a non-profit designed to facilitate charity care for non-primary health services to uninsured and underinsured individuals, including migrant and undocumented immigrants. For 2011 and 2012 he served as Board President. For three years he taught business classes at community colleges and at a

DEFENDANT'S SENTENCING
MEMORANDUM - 19

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

bilingual non-profit vocational school, providing job skills to Spanish-speaking immigrant workers.

## VI.

## THE SUPPORTING LETTERS

We are attaching for the court's consideration, after the exhibits to this memorandum, letters from three of Mr. Smulski's siblings, Lani Smulski Conti, Bonita Smulski, Ron Smulski and his ex, Sue Conti.  The letters make it clear that Smulski comes from a law-abiding family, which intensifies the shame that anyone in his position would feel.  His father, a retired member of the United States Marine Corps, was strict – a "brusque taskmaster," as his sister Lani describes him – but Smulski did not rebel.  He internalized the values of industriousness, obedience and respect for law.

Mr. Smulski was much younger than four of his siblings, and the household in which he grew up consisted of his parents and a disabled sister.  Perhaps as a result, he is a very private person.  He is highly intelligent, but, as sometimes happens with the intellectually gifted, he can come across as haughty and unapproachable.  Perhaps if he were better able to communicate, he could have better handled the stresses associated with working for an undercapitalized employer in a highly regulated industry.  Perhaps if he were better able to work collaboratively, *i.e.*, with Soundpath's CEO and comptroller, he would not have felt that the future of Soundpath was on his shoulders.  These things do not justify, but they may explain, his commission of the offense.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

# VII.

## RECOMMENDATION AS TO PLACE OF INCARCERATION

If the court concludes that a sentence to incarceration is required, we request that the court include in its judgment a non-binding recommendation that the Federal Prison Camp at Sheridan be designated as the facility at which Mr. Smulski must serve his sentence.

# VIII.

## CONCLUSION

We could present a more extensive discussion of the evidence bearing on Mr. Smulski's intent with regard to the $631,500. He did not seek out the sale-leaseback transactions; they resulted from an unsolicited call from Marquette. He sought board approval for the sale leasebacks, though it might not have been required. He did not spend any of the money involved for his own personal benefit. The $24,140 funds transfer to Transtar represented an "overdrawing" the Soundpath funds, by $140. He made no effort to conceal the fact that the funds came to Soundpath from Trucaris; Soundpath's bank records clearly showed that the money came from Trucaris.

However tempting it may be to dwell on the question of whether the fraud was "about to be discovered," the crucial facts justify a substantial variance from the Guidelines (as the Probation Office, in recommending a sentence of one year and one day, has concluded). Mr. Smulski transferred all of the remaining Marquette-related funds to Soundpath, prior to his last day. Soundpath did not suffer any loss, and the company was able to benefit from the sale-leaseback as Mr. Smulski originally intended. Mr. Smulski has provided his counsel with funds to reimburse Soundpath for all of the professional expenses it claimed, resulting from his actions.

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391

(Those funds would be in Soundpath's account now, but for the government's suggestion that the funds be paid into the court's registry at the time of sentencing.)  He is 58 years old and has lived a law-abiding life.  Data show that for an individual of his age, the risk of recidivism is low.  He is no longer a CPA.  He has a felony conviction.  His employment prospects, as far as obtaining any position involving the employer's extension of trust, are bleak.  He has lived with the stress of this unresolved matter for much of the past five years.

Under all the circumstances, the court should sentence Mr. Smulski to three years' probation, with the conditions outlined at the outset of this memorandum.

DATED this 21st of June, 2017.

Respectfully Submitted,

/s/ Allen R. Bentley
ALLEN R. BENTLEY
WSBA No. 12275
Law Office of Allen R. Bentley
1111 Third Avenue
Suite 2220
Seattle, WA 98101
Telephone:  (206) 343-9391
Fax:  (206) 682-3746
E-mail: abentley@concentric.net

DEFENDANT'S SENTENCING
MEMORANDUM - 22

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA  98101-3207
(206) 343-9391

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2017 I electronically filed the foregoing Sentencing Memorandum with the Clerk of the Court using the CM/ECF system which will send notification of such filing to Assistant United States Attorney Francis Franze-Nakamura, the attorney(s) of record for the United States of America, via the court's e-filing system.

/s/ Allen R. Bentley
ALLEN R. BENTLEY
Law Offices of Allen R. Bentley
1111 3rd Ave, Ste 2220 Seattle, WA 98101
(206) 343-9391; fax: (206) 682-3746
E-mail: abentley@concentric.net

DEFENDANT'S SENTENCING
MEMORANDUM - 23

Law Offices of Allen R. Bentley
1111 Third Avenue, Suite 2220
Seattle, WA 98101-3207
(206) 343-9391